Dolores Lyons Ambrose, et al. [1] v. Commissioner. Ambrose v. Commissioner
Docket Nos. 60157, 60158, 68314.
United States Tax Court
T.C. Memo 1960-232; 1960 Tax Ct. Memo LEXIS 54; 19 T.C.M. (CCH) 1301; T.C.M. (RIA) 60232; October 31, 1960
James A. Ronayne, Esq., 120 Broadway, New York, N. Y., for the petitioners. John I. O'Toole, Esq., and Edward Delaney, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined deficiencies in the petitioners' income taxes and additions to tax as follows: Dolores Lyons Ambrose (Docket No. 60157) Additions to Tax
Section
Section
Section
Section
Year
Deficiency
291(a)
293(b)
294(d)(1)(A)
294(d)(2)
1949
$ 2,765.94
$ 691.48
$ 1,382.97
$ 276.59
$ 165.96
1950
27,023.41
6,755.86
13,511.71
2,702.34
1,621.41
1951
4,160.59
2,080.30
416.06
249.63
1952
4,054.33
2,027.17
237.26
1953
5,872.77
2,936.39
340.37
$ 43,877.04
$7,447.34
$21,938.54
$3,394.99
$ 2,614.63
Total taxes and
$ 79,272.54
additions to tax
*55 Dominick Ambrose (Docket No. 60158) Additions to Tax
Section
Section
Section
Section
Year
Deficiency
291(a)
293(b)
294(d)(1)(A)
294(d)(2)
1945
$ 27,816.05
$13,908.03
$ 1,623.96
1946
55,343.53
27,671.77
3,328.22
1947
32,891.26
16,445.63
1,913.48
1948
39,157.99
19,579.00
2,289.48
1949
12,219.00
6,109.50
$1,221.90
733.14
1950
7,112.15
$2,380.17
952.07
571.24
1952
12,499.26
3,124.81
1,249.93
749.96
1953
28,297.40
2,829.74
1,697.64
$215,336.64
$5,504.98
$83,713.93
$6,253.64
$ 12,907.12
Total taxes and
$323,716.31
additions to tax
In Docket No. 68314 respondent determined the liability of Dolores Lyons Ambrose, as transferee, for the following portions of the deficiencies and additions to tax assessed against Dominick Ambrose: Deficiency
$160,404.25
Additions to tax
80,738.39
Total
$241,142.64
The deficiency notices in Docket Nos. 60157 and 60158 were dated August 15, 1955, and in both cases the deficiencies and additions to tax were assessed by jeopardy assessments on the Brooklyn director's Special No. 1 August 1955 List. The deficiency *56 notice in Docket No. 68314 was dated March 21, 1957, and the deficiencies and additions to tax involved therein were assessed by a jeopardy assessment on the Brooklyn director's Special No. 7 February 1957 List. The issues for decision are: (1) Whether respondent is justified in using the so-called net worth method in computing the net income of petitioner and whether his net worth computations correctly reflect the taxable net income of Dolores Lyons Ambrose for the years 1949 to 1953, inclusive, and the taxable net income of Dominick Ambrose for the years 1945 to 1948, inclusive. In his amended answer to the petition in Docket No. 60158, respondent claimed, as an alternative basis of recovery to that set forth in the statutory notice of deficiency, that Dominick had unreported income of $56,983.48 in 1950 and $44,377.77 in 1953, and therefore was liable for deficiencies in those years of $19,582.05 and $24,249.39, respectively, plus additions to tax under section 293(b) of the 1939 Internal Revenue Code. This alternative pleading becomes an issue only in the event we decide that the assets attributed to Dolores Lyons Ambrose in Docket No. 60157 are properly attributable to Dominick *57 Ambrose. (2) Whether any part of the deficiencies asserted against Dolores Lyons Ambrose for the years 1949 to 1953, inclusive, and against Dominick Ambrose for the years 1945 to 1948, [2] inclusive, is due to fraud with intent to evade tax within the meaning of section 293(b) of the Internal Revenue Code of 1939. (3) Whether Dolores Lyons Ambrose, with respect to the years 1949 and 1950, and Dominick Ambrose, with respect to the years 1950 and 1952, are liable for additions to tax under section 291(a) [3] for failure to file returns within the time prescribed by law. (4) Whether Dolores Lyons Ambrose, with respect to the years 1949 to 1951, inclusive, and Dominick Ambrose, with respect to the years 1949, 1950, 1952, and 1953, are liable for additions to tax under section 294(d)(1)(A) for failure to file declarations of estimated tax. (5) Whether Dolores Lyons Ambrose and Dominick Ambrose, with respect *58 to all the years involved in Docket Nos. 60157 and 60158, are liable for additions to tax under section 294(d)(2) for substantial underestimation of estimated tax. (6) Whether Dominick Ambrose had unreported dividend and interest income for the years 1949, 1950, 1952, and 1953. (7) Whether Dominick Ambrose claimed excessive depreciation with respect to his business assets for the years 1949 and 1950. (8) Whether Dominick Ambrose overstated business and rental expenses for the years 1949, 1950, 1952, and 1953. (9) Whether Dominick had a net operating loss carryover from 1949 available for the years 1950, 1952, and 1953, and, if so, in what amount. (10) Whether in Docket No. 68314 Dolores Ambrose is liable, as a transferee of the assets of Dominick Ambrose, for the deficiencies and additions to tax asserted against him in Docket No. 60158, to the extent of the value of the assets transferred. Findings of Fact Some of the facts have been stipulated. The stipulation and the exhibits attached thereto, are incorporated herein by this reference. The petitioners Dominick Ambrose and Dolores Lyons Ambrose (hereinafter sometimes referred to, respectively, as Dominick and Dolores) *59 are husband and wife, and reside in Patchogue, New York. Their individual Federal income tax returns were filed with the then collector and/or director of internal revenue for the first district of New York, as follows: Dominick Ambrose
Year
Date Filed
1945
March 14, 1946
1946
March 4, 1947
1947
March 15, 1948
1948
August 31, 1949
1949
September 13, 1950
1950
February 1, 1954
1952
February 1, 1954
1953
March 15, 1954
Dolores Lyons Ambrose
1949
No return
1950
No return
1951
March 17, 1952
1952
March 16, 1953
1953
March 15, 1954
Dominick Ambrose was born in 1900. He left school after completing the sixth grade and went to work. From 1920 to 1923 he and a partner ran a busline in Flushing, New York. In the latter year, however, a competing trolley company secured an injunction and forced them to cease operations; whereupon Dominick established the Suffolk-Nassau Amusement Co., a sole proprietorship which furnished automatic coin-operated phonographs and games of the pinball variety (hereinafter called jukeboxes and games) to taverns, diners, luncheonettes, and similar business establishments in the Long Island, New York, area. He was *60 continuously and exclusively engaged in this business from 1923 until its sale in April of 1954. Dominick and Dolores were married on November 26, 1940. She began the study of law in 1943 and was admitted to practice in New York on March 21, 1945. The costs of her legal education were borne by her parents. From 1945 until late 1950 Dolores performed legal services on a voluntary basis for the felony court and domestic relations panels of the Queens Women's Bar Association. She devoted approximately 2 days a week to this work, but received no fees therefrom. Otherwise, Dolores's professional activities during most of that period consisted of handling various legal problems that arose in the course of her husband's business. At the same time she was active in local charitable and political organizations, and in 1951 was a candidate for justice of the peace of Brookhaven, New York. In late 1949 or early 1950 Dominick retained an attorney in Brooklyn, New York, to handle two major lawsuits with the understanding that, as part of the fee, Dolores would be associated with him in their preparation. Accordingly, Dolores went to work in his office, and in 1950 she rented an adjoining *61 office for which she paid approximately $50 a month. In 1951 she opened a second office in Patchogue by remodeling an apartment in a building owned by her husband. Dolores incurred transportation expenses going to and from her office in Brooklyn, and she spent $4,722.15 equipping her office in Patchogue. During the years 1945 to 1949, inclusive, Dominick was the sole source of family income. Dolores did not begin to practice law profitably until 1950. The petitioners' home was a 6-room stone house in a residential section of Patchogue. The house was situated on a sizable lot and had a 2-car detached garage. Dominick built the house in 1939 and added the garage somewhat later. In maintaining their home the petitioners incurred expenses for heating, utilities, and real property taxes. The latter ranged between $400 and $500 a year for the period 1945 to 1953. In 1949 the petitioners bought a new Cadillac automobile, in part payment for which Dolores traded in a prewar Chevrolet. The balance due was paid in 36 monthly installments of approximately $100. Dominick, with the aid of one assistant, maintained and repaired all of the machines used in his business. As the result, he *62 worked long hours and was away from home much of each day, particularly during the summer months. He lived frugally, spent very little for clothes, and frequently received free meals from the proprietors of establishments he visited on service calls. Since Dominick rarely returned home until late in the evening, Dolores customarily spent several days a week at her parents' home, and took many meals there, for which she paid nothing. In making the net worth computations involved herein, respondent determined that Dominick and Dolores together had living expenses of $11,175 for the years 1945 through 1948, and that Dolores alone had living expenses of $5,200 for the years 1949 through 1953. However, by his amended answer in Docket No. 60158, respondent alleged their combined living expenses to be $5,200 for 1950 and $4,827.79 for 1953, and on brief states those figures as $5,200 for each of the years 1950 and 1953. In addition to personal expenditures for real property taxes on their home, heating, electricity, water, food, and clothing, the petitioners, during the period from 1945 to 1953, inclusive, spent sums for life insurance premiums, interest on personal loans, automobile *63 payments, and transportation. In 1951 and 1952 Dolores incurred expenses and made contributions in connection with her activities in local political organizations. Dominick paid the funeral expense for his parents in 1945. For the years 1945, 1946, 1947, and 1948 the living expenses of the petitioners were in the respective amounts of $4,000, $3,600, $3,600, and $3,800. For the years 1949 through 1953 the living expenses of each petitioner were as follows: Year
Dominick
Dolores
1949
$3,400
$1,600
1950
3,400
1,800
1951
3,400
2,200
1952
3,000
2,200
1953
3,000
2,200
During the years relevant herein the Suffolk-Nassau Amusement Co. had approximately 400 customers or locations, of which 75 to 100 were situated in ocean beach resort areas and therefore were only open in the summer months and were left in their seaside locations unused and untended during the remainder of the year. Dominick owned all the jukeboxes and games used in the business. He employed four collectors who made weekly calls upon each establishment where a machine was placed and divided the receipts therefrom with the proprietor. As a general rule this division was on a 50-50 basis, *64 although in order to obtain a choice location Dominick would sometimes permit the proprictor to retain all receipts for the first 2 weeks. In addition to these employees Dominick had a small clerical staff which kept the books of the business, including records of the amounts turned in by the collectors. From 1942 through 1945 Dominick could not obtain new jukeboxes and games because of the war; only used machines were available, and for these he had to pay unusually high prices - $800 to $825 for a jukebox normally worth no more than $100 and slightly over $500 for a game. In 1946, when new machines could once again be had, Dominick found it necessary to replace all the jukeboxes and games on hand. This was required not only because they were almost completely worn out but also because his customers demanded the latest models. Of the total number of machines replaced approximately two-thirds were games and the balance jukeboxes. In the postwar years a new jukebox cost $914 and a new game $511. Jukeboxes and games are complex and rather delicate pieces of electro-mechanical equipment. They require constant maintenance, and are peculiarly susceptible to the warping and corrosive *65 effects of humid or salt air. For these reasons the fact that a particular machine is not in active use the year round does not increase its physical life if it is left unserviced in a location near the ocean while unused. Under favorable atmospheric conditions the maximum useful physical lives of jukeboxes and games are 3 1/2 years and 2 years, respectively, but this is only the case if they are repaired and maintained by the owner himself. As a practical matter, however, their useful commercial lives are shorter because of the annual introduction of stylistic and/or mechanical modifications by the manufacturers which render the older models commercially obsolete. Dominick's customers insisted that he provide them with the latest models of jukeboxes and games, and where the location was a lucrative one he deemed it expedient to oblige. The superseded machines could sometimes be placed in poorer locations but after 1 to 2 years in the case of games and 2 to 3 years in the case of jukeboxes he was no longer able to place them with any of his customers. When this happened it was Dominick's practice to destroy the games; the old jukeboxes, however, he retained and stored in warehouses. *66 Dominick considered that the jukeboxes and games used in his business had a composite useful life of 3 years, and he depreciated them at an annual rate of 33 1/3 per cent on his returns for the years in issue here. This rate had been approved by respondent when he audited Dominick's returns for the years 1939 through 1941. However, in computing Dominick's net worth for the years 1945 through 1948 and in adjusting his taxable net income for the periods 1949-50 and 1952-53, respondent determined that the composite useful life of jukeboxes and games was 6 years. Because of the obsolescence and physical deterioration to which they were subject, the average useful life of the jukeboxes and games involved herein was 3 years. Beginning in 1923 Dominick followed the practice of lending money in varying amounts and on an informal basis to the proprietors of establishments served by the Suffolk-Nassau Amusement Co. He charged no interest and considered the loans to be useful in engendering harmonious business relationships with his customers. During the 1930's more and more of his customers turned to him for loans, but few were able to repay the amounts borrowed because of the difficult *67 economic conditions that prevailed throughout that period. As the result by 1942 the unpaid balances on these loans had reached a substantial figure. Dominick made notations of the loan transactions, but they were, for the most part, lost or destroyed when he sold the business in 1954. Based on the meager remaining records, which were thereafter made available to him, Dominick's accountant, who was associated with him from 1952 on, was able to substantiate outstanding loans of $12,544.25 as of December 31, 1944. Collections were made on these loans as follows: $2,000 in 1945; $2,000 in 1946; $4,000 in 1947; $4,000 in 1948; and $544.25 in 1949. On or about January 1, 1945, Dominick purchased a route consisting of a number of jukeboxes and games already in place in various business establishments on Long Island. The purchase price was $34,000 cash. However, the seller, the Empy Distributing Company of New York City, granted Dominick the privilege of operating the route for 1 or 2 months before payment became due. Dominick paid the entire $34,000 in the last days of January 1945. The major portion of this sum came from a $20,000 loan that he obtained late in that month from a bank *68 in New York City, and the balance from funds he had on deposit with The Peoples National Bank of Patchogue. During the month of January 1945 Dominick deposited a total of $19,226.03 in his account with The Peoples National Bank, as follows: Date
Amount
January 5
$ 1,531.50
January 18
707.45
January 24
2,000.00
January 27
5,000.00
January 29
8,787.08
January 30
1,000.00
January 31
200.00
Total
$19,226.03 As of December 31, 1944, Dominick and Dolores had substantial holdings of United States Government savings bonds. Five of these bonds having a total face value of $5,000 were issued in December 1941 to Dolores by The Peoples National Bank of Patchogue, and on the same date the same bank issued to Dominick six bonds having a total face value of $5,000. Six of these bonds having a total face value of $5,000 were issued to Dominick in November 1942 by the same bank. In April 1943 the same bank issued two bonds each having a face value of $1,000 to Dominick, and three bonds each having a face value of $1,000 to Dominick payable on death to Dolores. In September 1943 the Bank of Smithtown, Smithtown Branch, New York, issued five of these bonds each having *69 a face value of $1,000 to Dominick or Dolores. In February 1944 The Union Savings Bank of Patchogue issued five of these bonds each having a face value of $1,000 to Dolores, and The Peoples National Bank issued two of these bonds each having a face value of $100 to Dominick or Dolores. In July 1944 the latter bank issued five of these bonds each having a face value of $1,000 to Dominick payable on death to Dolores, and in December of that year The Patchogue Citizens Bank & Trust Co. of Patchogue issued a bond having a face value of $100 to Dominick or Dolores. In January 1945 Dominick acquired five additional United States savings bonds, Series E, in the denomination of $1,000 each, which were issued by The Peoples National Bank of Patchogue to Dominick or Dolores. We find that the joint assets and liabilities of petitioners as of December 31, 1944, 1945, 1946, 1947, and 1948 consisted of the items and were in the amounts set forth in detail in paragraphs 3, 4, 5, 7, 8, 9, 11, 12, and 13 of the stipulation of facts except that there should be included in the assets for those years an item "business loans receivable" in the amount of $12,544.25 as of December 31, 1944; in the amount *70 of $10,544.25 as of December 31, 1945; in the amount of $8,544.25 as of December 31, 1946; in the amount of $4,544.25 as of December 31, 1947; and in the amount of $544.25 as of December 31, 1948. The joint net worth of petitioners increased during the years 1945, 1946, 1947, and 1948 in the respective amounts of $28,713.21, $59,127.15, $11,766.15, and $24,235.28. Dominick paid Federal taxes for the years 1945 and 1947 in the respective amounts of $910.72 and $876.84. Dominick's Federal tax returns for the years 1945 through 1948 reported a net loss in the amount of $628.36 for the year 1945, income in the amount of $5,819.19 for the year 1946, a net loss in the amount of $1,763.22 for the year 1947, and a net loss in the amount of $99.82 for the year 1948. Dominick's net income for the years 1945 through 1948 was as follows: 1945
$33,623.93
1946
62,727.15
1947
16,242.99
1948
28,035.28
Dolores did not receive income during those years. Dominick's net worths as of December 31, 1949, 1950, 1951, 1952, and 1953, appearing from the items and amounts of assets and liabilities set forth in paragraphs 29 through 38 of the stipulation of facts, were in the *71 respective amounts of $205,947.15, $163,796.88, $131,240.42, $126,429.35, and $137,009.39, without taking into consideration any liability of Dominick for unpaid Federal taxes. We find that the assets and liabilities of Dolores as of December 31, 1948, 1949, 1950, 1951, 1952, and 1953 consisted of the items and were in the amounts set forth in detail in paragraphs 14 through 23 and 25 through 27 of the stipulation. The net worth of Dolores increased during the years 1949 through 1953 in the respective amounts of $7,321.30, $42,758.18, $9,492.06, $6,835.41, and $10,373.59. Dolores had no likely source of income in 1949. Dolores paid Federal income taxes for the years 1952 and 1953 in the respective amounts of $75 and $100. In 1950 Dolores received a loan or a gift from Dominick in the sum of $26,259.89 which she used to buy securities. The net income of Dolores for the years 1950 through 1953 was as follows: 1950
$18,298.29
1951
11,692.06
1952
9,110.41
1953
12,673.59
Dolores filed no Federal income tax returns for 1949 and 1950. Her returns for 1951, 1952, and 1953 reported net losses in the respective amounts of $201.25, $649.99, and $1,191.99. *72 In the absence of any testimony to the contrary, we find that Dominick received additional income on account of dividends and interest and on account of rental income in the years 1949, 1950, 1952, and 1953 in the amounts determined by respondent. Of the amounts of the deductions on account of business expenses taken by Dominick in his returns for those years, and disallowed by respondent, Dominick is entitled to deductions in the following amounts: 1949
$21,557.06
1950
21,711.38
1952
26,317.20
1953
30,385.25
The deductions allowable to Dominick on account of depreciation for those years will be computed in accordance with our finding as to the proper rate of depreciation. Recomputations under Rule 50 will determine the proper amounts of net operating loss deductions, if any, available to Dominick for the years 1950, 1952, and 1953. A part of the deficiencies assessed against Dominick for the years 1945, 1946, and 1948 was due to fraud with intent to evade tax. Dominick failed to file timely final returns for the years 1950 and 1952. His failure to do so was due to willful neglect and not to reasonable cause. Dominick failed to file declarations *73 of estimated tax for the years 1949, 1950, 1952, and 1953. His failure to do so was due to willful neglect and not to reasonable cause. Dominick substantially underestimated his estimated tax for the years 1945, 1946, 1947, and 1948. A part of the deficiencies assessed against Dolores in Docket No. 60157 for the years 1950 to 1953, inclusive, was due to fraud with intent to evade tax. She owed no tax for 1949, and therefore the fraud penalty assessed against her for that year was improperly imposed. Dolores failed to file timely final returns for 1949 and 1950. Her failure to do so in 1950 was due to willful neglect and not to reasonable cause. Dolores failed to file declarations of estimated tax for the years 1949, 1950, and 1951. Her failure to do so with respect to the years 1950 and 1951 was due to willful neglect and not to reasonable cause. Dolores substantially underestimated her taxes for the years 1952 and 1953. On April 26, 1954, Dominick sold the Suffolk-Nassau Amusement Co. to Sanford J. Moore for $339,082.64. Dominick received $150,000 in cash and took back a series of installment notes for the balance of $189,082.64. The notes were secured by a chattel mortgage *74 which was executed on April 26 and duly recorded on April 28, 1954. On the date of sale, April 26, Dominick made an oral assignment of the notes and chattel mortgage to his wife, Dolores. This assignment was subsequently reduced to writing on December 29, 1954. The notes and chattel mortgage as of the date of transfer, April 26, 1954, had an undisclosed value. They proved to be uncollectible and had no value in 1958. Thereafter, Dominick made three additional transfers of property to Dolores. On or about July 9, 1954, he purchased a cashier's check drawn on the Patchogue Bank and payable to Dolores in the amount of $42,000. Dolores applied $24,548.52 thereof to discharge the balance due on a loan she had obtained from the Lafayette National Bank. The remaining $17,451.48 was credited to her personal account with that bank. The second transfer consisted of 149 shares of Patchogue Bank common stock which Dominick delivered to Dolores late in 1954 and which were registered in her name on or about February 7, 1955. The final transfer occurred on January 21, 1955, and consisted of 400 shares of the common stock of Remington Arms. The market value per share of this stock on the date *75 of transfer was $11.50. Certificates representing the 400 shares were subsequently issued to Dolores on June 13, 1955. Dolores paid no consideration for the transfers of the chattel mortgage, the cashier's check, and the Remington Arms and Patchogue Bank stock. Dominick's net worth as of December 31, 1953, computed without regard to any liability for Federal taxes and with the value of his capital in Suffolk-Nassau Amusement Co. shown as its book value of $72,616 instead of its apparent greater fair market value, was $137,009.39. The record does not show his net worth as of any date later than December 31, 1953. Opinion KERN, Judge: The first question in these cases is whether respondent may properly compute Dominick's taxable income for the years 1945 through 1948 by the so-called net worth method. Dominick contends that respondent has not shown in specific and material detail that his books of account were inadequate and that respondent by reason of his making specific adjustments with regard to Dominick's reported income for the other years involved has inferentially acknowledged the accuracy of Dominick's books. We do not agree with these contentions. In these cases the *76 stipulated facts show large increases in Dominick's net worth for the years 1945 through 1948 which are inconsistent with the income reported by him for those years. While his books are not in evidence, it may be assumed that his tax returns were made up pursuant to his books. Under these circumstances, the discrepancy between the income disclosed by Dominick's books and the increases in his net worth is of itself strong evidence that the books are unreliable and warrant the respondent in using the net worth method in computing taxable income. Morris Lipsitz, 21 T.C. 917, affd. 220 F. 2d 871, certiorari denied 350 U.S. 845. The fact that respondent has not computed Dominick's income for the other years here involved by the net worth method is not a concession on his part that Dominick's books are correct; it merely indicates that since there was no inconsistent increase in Dominick's net worth for those years there was no evidence affirmatively showing that the books were unreliable as to those years. Dominick next argues that the respondent's computation *77 of his income for 1945 through 1948, even though based on facts and figures stipulated by the parties, is not accurate because of his contention that the figures making up his assets at the beginning of this period do not include the following items: (1) Loans receivable in the amount of $70,000, (2) undeposited cash of $15,000, and (3) accounts receivable from his locations in Camp Upton in the amount of $3,750 which was paid to him in 1945 in the form of savings bonds with a value of $5,000 at maturity. These contentions upon which, of course, Dominick has the burden of proof are supported only by petitioners' uncorroborated self-serving testimony. With regard to the loans receivable, petitioners' accountant was only able to substantiate $12,544.25 of such loans and, although Dominick testified that some of these loans were in substantial amounts, he made no attempt to prove the existence as of December 31, 1944, of any loan not substantiated by his accountant by calling to the stand any alleged debtor. We are not inclined to accept the general uncorroborated self-serving testimony of petitioners [4] as successfully carrying their burden of proving error in the respondent's determination. *78 We have, however, found, as respondent now concedes, that there were outstanding loans receivable by Dominick as of December 31, 1944, in the amount of $12,544.25. These loans receivable were collected during the ensuing years and we gathered from Dominick's testimony that practically all were collected by 1949 with most of them being collected in 1947 and 1948. We have accordingly approximated in our findings the amounts of such outstanding loans constituting assets of Dominick on December 31, 1944, 1945, 1946, 1947, and 1948, and have found his net worth for the last 4 of those years accordingly. The testimony concerning the $15,000 cash which Dominick contends was on hand as of December 31, 1944, in addition to the cash stipulated, is even less convincing. It is not even corroborated by his wife's hearsay testimony and his own testimony on this was contradictory. He testified on direct examination that he had cash in the amount of $15,000 while on cross-examination he testified that he "had about $12,000." It is stipulated that on this date *79 he had cash in four banks in the total amount of $6,333.40, and Dolores had cash in two banks in the total amount of $5,145.13. No reason is given as to why he should have additional undeposited cash in the sum of $15,000 or $12,000. With regard to his contention that he had as of December 31, 1944, an account receivable in the amount of $3,750 from locations which he had in Camp Upton and which was paid to him in the form of United States savings bonds having a total value upon maturity of $5,000, we are likewise unable to accept Dominick's selfserving testimony. He contends that some corroboration of this is found in an exhibit accompanying the stipulation of facts which shows Dominick's and Dolores's savings bonds' acquisitions during the years 1941 to 1946, inclusive. This exhibit shows that on several occasions savings bonds costing a total price of $3,750 were issued to petitioners. However, some of these were issued in the name of Dominick alone, some in the name of Dolores alone, some in the the name of Dominick payable on death to Dolores, and some in the name of Dominick or Dolores. It also shows that three different banks served as issuing agents. These facts are less *80 consistent with Dominick's contention that he left all matters of accounting in connection with his locations at Camp Upton to certain officers stationed there who remitted his share of the "take" in the form of bonds than with the inference that he bought the bonds himself with his own funds. The other contention of Dominick which is common to all years involving his tax liability has to do with the proper rate of depreciation on the jukeboxes and games. As indicated in our findings of fact we have decided this issue in favor of Dominick. This decision has been made after a careful consideration of all of the facts of record, most of which have been set forth in our findings. We think that they adequately suport Dominick's contentions with regard to this issue. With regard to the additions to tax on account of fraud, the burden of proof is, of course, upon the respondent and he is not relieved of this burden by the fact that petitioners have not successfully borne their burden of proof as to the deficiencies in tax determined by respondent. Sidney Cohen, 27 T.C. 221, 228, 229. *81 Therefore we have approached the question as to whether any part of the deficiencies in Dominick's taxes for the years 1945 through 1948 was due to fraud not on the assumption that these deficiencies were in the amounts determined by us in our findings (a determination based largely upon the doctrine of burden of proof) but on the assumption that his net worths for those years were in the amounts shown by the stipulation of the parties [5] plus $12,000 in undeposited cash and accounts receivable of $3,750 as of December 31, 1944, and loans receivable in an amount of $60,000 as of that date which was collected to the extent of $10,000 in 1945, $10,000 in 1946, $20,000 in 1947, and $20,000 in 1948. Using these figures (which we think are the largest which petitioners in reason could contend for) in computing increases in net worth and the figures we have found as living expenses (in amounts most generous to petitioners), it is apparent that Dominick's net income for 1945, 1946, and 1948 was in excess of $9,000, $50,000, and $12,000, repectively, whereas he reported net losses for 1945 and 1948 and income for the year 1946 in the amount of only $5,819.19. [6] Such gross understatements *82 of income during 3 of 4 consecutive years, without adequate explanation, are evidence of fraud which, under the facts of these cases, we have found to be convincing. No discussion is required in this opinion concerning the tax liability of Dominick for 1949, 1950, 1952, and 1953. The questions incident thereto have been disposed of by our findings, which we consider to be supported by the record and the stipulation of the parties. With regard to the tax liability of Dolores for 1949, the respondent has not proved the existence of a likely source of income to her during that year since it clearly appears from the record that she did not begin the profitable practice of her profession until sometime in 1950. In order to validate the computation of her taxable income by the so-called net worth method, it is necessary either for this fact to be established or that all sources of nontaxable *83 income be negated. United States v. Massei, 355 U.S. 595; Commissioner v. Thomas, 261 F. 2d 643. This respondent has not done as to 1949. As to the succeeding years during which Dolores had a likely source of income the stipulated facts show a substantial increase in net worth for each of them. Dolores seeks to explain these increases as representing gifts or loans made to her by Dominick. Her testimony was sometimes vague, self-contradictory, and contradicted with regard to details by the stipulation. However, with regard to one alleged loan or gift made to her by Dominick in 1950 her testimony was convincing and supported by the stipulated facts, and we have found that in that year she received a large loan or gift from Dominick which was used in the purchase of securities forming a part of her assets as of the last of the year and to that extent her increase in net worth did not represent income. However, even with that adjustment, her annual increases in net worth plus personal expenditures for 1950 through 1953 indicated the receipt by her of substantial net income for each of these years in amounts ranging from over $9,000 to over $18,000. She filed *84 no return for 1950 and her returns for 1951 through 1953 showed net losses. With regard to the issue of fraud as to Dolores, it is our opinion that the stipulated facts modified by Dolores's testimony when it was credible constitute clear and convincing proof that Dolores so consistently and knowingly understated her net income for 4 consecutive years in such large amounts as to warrant a conclusion that a part of her deficiencies in tax for each of those years was due to fraud. In this connection we have noted the fact that Dominick's net worth declined during this period, but we cannot assume, in the absence of credible and specific testimony by Dominick and Dolores both of whom testified herein, that the increases in Dolores's net worth during these years were due to gifts or loans from Dominick simply because the net worth of Dominick declined. The determination of transferee liability against Dolores for the tax liability of Dominick as transferor was predicated upon a determination that he had made certain transfers of property to her "during the years 1954 and 1955." The burden of *85 proof resting upon respondent in transferee cases includes the burden of proving that at the time of making the alleged transfers the transferor was insolvent or was rendered insolvent by such transfers. James M. Denton, 21 T.C. 295. The only material facts in the record concerning Dominick's solvency are his net worth figures stipulated for December 31, 1953, and his later sale in April 1954 of his amusement company (in which his capital was shown to be $72,616) for a price of $339,082.64, part of which was represented by a mortgage note. The value of this note as of the time of sale is not shown. The assets shown in the net worth statement were obviously carried at their cost figures. Their fair market value is not shown by the record. Under these circumstances we are unable to conclude that respondent has successfully borne his burden of proof in the transferee proceeding. Other issues are disposed of in our findings of fact and require no discussion in this opinion. Decisions under Rule 50 will be entered in Docket Nos. 60157 and 60158. Decision will be entered for the petitioner in Docket No. 68314. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Dominick Ambrose, Docket No. 60158, and Dolores L. Ambrose, Transferee, Docket No. 68314.↩
2. Respondent concedes on brief that there should be no addition to tax under section 293(b)↩ with respect to the deficiency assessed against Dominick Ambrose for the year 1949.
3. All statutory references are to the Internal Revenue Code of 1939 unless otherwise noted.↩
4. Dolores testified that on one occasion in 1944 Dominick told her that he had outstanding loans of "over $60,000 - probably $70,000."↩
5. Except as to depreciation as to which, as we have indicated, we have taken the figure stipulated by the petitioners. ↩
6. According to the method outlined above, the income of Dominick for the year 1947 was in an amount which we consider de minimis and not supporting any allegation of fraud.↩